IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 01–cv–02354–EWN–MJW


UNITEDGLOBALCOM, INC.;
UIH ASIA/PACIFIC COMMUNICATIONS, INC.;
AUSTAR UNITED COMMUNICATIONS, LIMITED;
AUSTAR ENTERTAINMENT PTY LTD;
CTV PTY LIMITED; and
STV PTY LIMITED,

      Plaintiffs,

v.

ROBERT G. McRANN,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____


      This is a contract dispute arising out of an employment agreement in a case that has been

stayed and administratively closed since August 2003. Plaintiffs UnitedGlobalcom, Inc. ("UGC"),

UIH Asia/Pacific Communications, Inc. ("UIH Asia"), Austar United Communications Ltd.

("Austar United"), Austar Entertainment Pty. Ltd. ("Austar Entertainment"), CTV Pty. Ltd.

("CTV"), and STV Pty. Ltd. ("STV") (collectively, "Plaintiffs") sought to enjoin Defendant

Robert McRann, UGC's former employee, from pursuing a legal action against them in Australia

on the basis that McRann: (1) asserted a claim in Australia similar to one that the United States

-1-

District Court for the District of Colorado previously rejected; and (2) breached his employment contract by bringing suit in Australia.[1]  Additionally, Plaintiffs sought a declaratory judgment interpreting the employment contract.  This matter is before the court on: (1) "Plaintiffs' Request to Re-Open Administratively Closed Case for Purpose of Accepting Voluntary Dismissal by Plaintiff [sic]," filed June 12, 2006; and (2) "Defendant's Motion for Preferential Trial Date Pursuant to [Colorado Revised Statutes section] 13–1–129," filed November 21, 2006.  Jurisdiction is premised upon diversity of citizenship, pursuant to 28 U.S.C.S. § 1332 (LexisNexis 2007).

## FACTS

### 1.    Factual Background

This dispute originated with the termination of McRann's employment as chief operating officer of A-2000, a Dutch company headquartered in Amsterdam, in which UGC holds a fifty-percent interest.  (Compl., Ex. 2 [8/23/99 Order] [filed Dec. 7, 2001] [hereinafter "Compl."].)  The sprawling contextual history necessary to frame the issue before the court spans nearly ten years, three countries, and multiple litigations, both domestic and foreign.  The court attempts to summarize the facts before it as clearly and succinctly as possible.

---

[1]Plaintiff Austar United was formerly known as United and Phillips Communications.  (*See* Order and Mem. of Decision at 3 n.1 [filed Sept. 2, 2003].)  Plaintiff UGC was known as United International Holdings, Inc. during at least some of the time McRann was in its employ.  (Compl. ¶ 1 [filed Dec. 7, 2001].)  Finally, since merging with Liberty Media International in 2005, Plaintiff UGC has been known as Liberty Global.  *See* Company Report at http://www.hoovers.com.  For the sake of simplicity, the court will refer to these entities by their names set forth on the case caption throughout this Order and Memorandum of Decision.

### a.     The Parties

UGC is a Delaware corporation with its principal place of business in Denver, Colorado. (*Id.* ¶ 1.)  UGC is in the business of owning and operating subscription television companies through its subsidiaries and affiliates.  (*Id.*)  UGC employs executives such as McRann and assigns, or "seconds," them to its subsidiaries and affiliates for specific jobs.  (*Id.*, Ex. 2 at 2 [8/23/99 Order].)  UIH Asia, an "indirect wholly-owned subsidiary" of UGC, is a Delaware corporation with its principal place of business in Denver, Colorado.  (*Id.* ¶ 2.)  Austar United is a corporate entity through which UIH Asia and UGC operate cable television and direct broadcast satellite systems in Australia under the name "Austar."  (*Id.*)  CTV, STV, and Austar Entertainment are subsidiaries of Austar United.  (*Id.*)  Austar United, CTV, STV, and Austar Entertainment are all incorporated under the laws of New South Wales, Australia.  (*Id.*)

### b.     McRann's Employment with Austar

In early 1995, McRann began negotiating an agreement to become a seconded employee in Austar United's Australian office.  (*Id.* ¶ 7.)  McRann entered into a written employment agreement with UGC (the "Austar Employment Agreement") to be seconded as the managing director of Austar United and took the position in March 1995.  (*Id.* ¶¶ 7–9.)  In 1996, unhappy with the situation at Austar United, McRann began to seek other employment opportunities.  (*Id.* ¶ 8, Ex. 2 at 3 [8/23/99 Order].)  McRann ultimately learned about and interviewed for a position as chief operating officer at A-2000, another subsidiary of UGC located in Amsterdam, the Netherlands.  (*Id.*, Ex. 2 at 3 [8/23/99 Order].)  McRann has maintained that numerous misrepresentations about the position were made during the interviews, upon which he relied in

deciding whether to work at A-2000. (*Id.*, Ex. 2 at 4 [8/23/99 Order].) These alleged misrepresentations include statements that: (1) the chief operating officer could only be fired by two A-2000 decision makers, would have full responsibility for and authority over A-2000 profit and loss, and would have an employment term of four and one-half years; (2) Hans Wolfert, A-2000's notoriously difficult and temperamental chief executive officer, would have little or no operational involvement; and (3) A-2000's board of directors would intervene if any problems arose between Wolfert and McRann. (*Id.*, Ex. 2 at 3–4 [8/23/99 Order].) In June 1997, McRann accepted the chief operating officer position and subsequently began negotiating the terms of an employment agreement with A-2000. (*Id.*, Ex. 2 at 4 [8/23/99 Order].) On June 20, 1997, McRann sent a letter to UGC outlining his proposed terms for the A-2000 employment agreement. (*Id.*, Ex. 2 at 5 [8/23/99 Order].) On or about July 1, 1997, a UGC employee told McRann that a draft of the employment agreement (the "July 3 Draft Agreement") needed only one signature in order to be approved and, upon receipt of said signature, would be forwarded to McRann in Amsterdam. (*Id.*, Ex. 2 at 6 [8/23/99 Order].)

At the same time he was negotiating the employment agreement with A-2000, McRann began negotiating the termination and buyout of the Austar Employment Agreement. (*Id.* ¶ 10.) On July 2, 1997 — before executing an employment agreement with A-2000 — McRann signed a Compensation and Release Agreement (the "Release Agreement") terminating his employment with Austar United. (*Id.*)

**c.    The Release Agreement**

The Release Agreement provided that: (1) the Austar Employment Agreement would terminate on July 31, 1997, at which time McRann would receive a payment of $387,500 — representing fifty percent of his "incentive interest" in Austar United; and (2) McRann, at his option, would receive a second payment in March 1999 or later, in an amount based upon Austar United's asset value, but guaranteed to be between $387,500 and $775,000 — representing the remaining fifty percent of McRann's "incentive interest."[2]  (*Id.* ¶ 11.)  Regarding the latter, the Release Agreement stated:

> At any time during the twenty–four [] month period beginning on March 13, 1999, [McRann] may elect to require Austar [United] to purchase the balance of the [i]ncentive [i]nterest . . . .  At any time during the twelve [] month period beginning March 13, 2001, Austar [United] . . . may elect to purchase the [r]emaining [i]ncentive [i]nterest from [McRann]. . . .  There will be a minimum value for the [r]emaining [i]ncentive [i]nterest of []$387,500 and a maximum value of []$775,000 in the event the [r]emaining [i]ncentive [i]nterest is purchased by Austar [United] . . . at any time and for any reason.

(*Id.*, Ex. 1 ¶ 3 [Release Agreement].)  Significantly, paragraph six the Release Agreement provided that if Austar Untied were to become a publicly-traded company, "then [McRann] and Austar [United] agree that, in good faith, the [r]emaining [i]ncentive [i]nterest [would] be restructured into stock options or any comparable incentive arrangement offered to then current

---

[2]The Release Agreement defines "incentive interest" as the certain percentage McRann was deemed to own of Austar United's assets, subject to calculations for liabilities working capital, and EBITDA — earnings before interest, taxes, depreciation, and amortization.  (Compl. Ex. 1 ¶ 4 [Release Agreement].)

employees of Austar [United]." (*Id.* ¶ 6 [Release Agreement].)  Finally, the Release Agreement

provided:

> [McRann] gives up his right to bring any legal claims against [Plaintiffs] of any
> nature and related in any way, directly or indirectly, to his employment relationship
> with [Plaintiffs] pursuant to the [Austar Employment] Agreement or the
> termination thereof . . . .  This release in favor of [Plaintiffs] is intended to be
> interpreted in the broadest possible manner, to include all actual or potential legal
> claims that [McRann] may have against [Plaintiffs] in relation to the [Austar
> Employment] Agreement . . . .  This [Release] Agreement shall be governed by the
> laws of the State of Colorado, and may be enforced in any court of competent
> jurisdiction.

(*Id.*, Ex. 1 ¶¶ III–IV [Release Agreement].)

McRann has maintained that UGC and A-2000 made additional misrepresentations to him

while he was in the course of negotiating the Release Agreement.  (*Id.*, Ex. 2 at 5.)  These alleged

misrepresentations include UGC and UIH Asia officers' statements that: (1) UGC would make

McRann "whole" in drafting an A-2000 employment agreement; (2) an A-2000 employment

agreement had been drafted and was nearly complete immediately before McRann's departure for

Amsterdam; and (3) the terms of the Release Agreement and A-2000 employment agreement

were complete on June 23, 1997.  (*Id.*, Ex. 2 at 5 [8/23/99 Order].)  As noted above, at the time

McRann executed the Release Agreement, he had not yet executed a written agreement

memorializing the terms of his employment with A-2000.  (*Id.*, Ex. 2 at 5 [8/23/99 Order].)

### d.    *McRann's Employment with A-2000*

In Amsterdam on July 11, 1997, McRann met with UGC about the July 3 Draft

Agreement and requested a number of changes to the document.  (*Id.*, Ex. 2 at 6 [8/23/99

Order].)  After the meeting, McRann learned that no changes would be made for at least three

weeks, because the UGC officer in charge of negotiating the agreement was on vacation.  (*Id.*)
Once the officer returned, negotiation resumed and McRann and UGC circulated at least two
modified drafts of the A-2000 employment agreement.  (*Id.*, Ex. 2 at 7 [8/23/99 Order].)  In the
meantime, on July 31, 1997, McRann accepted a payment of $387,500 from Austar United, the
first payment contemplated under the Release Agreement.  (*Id.* ¶ 13.)

    The parties evidently have disputed how many A-2000 employment agreement drafts were
generated and circulated, but there is no dispute that the final draft of the agreement was dated
September 4, 1997 (the "September 4 Draft Agreement").  (*Id.*, Ex. 2 at 7 [8/23/99 Order].)
McRann refused to execute the September 4 Draft Agreement and demanded four additional
changes be made to the document.  (*Id.*)  UGC refused two of the proposed changes, positing that
they were materially different from the initial agreement it had reached with McRann.  (*Id.*)
Thereafter, McRann's working relationships with A-2000 and with Wolfert deteriorated rapidly.
(*Id.*)  On October 27, 1997, McRann wrote a memorandum to UGC, in which he: (1) complained
that he did not have a written employment contract; (2) stated he accepted the September 4 Draft
Agreement with the exception of the four changes he had requested; and (3) expressed his opinion
that complete corporate organizational restructuring would be necessary to improve A-2000's
performance.  (*Id.*, Ex. 2 at 7–8 [8/23/99 Order].)  On October 31, 1997, McRann wrote another
memorandum detailing the organizational changes he deemed necessary.  (*Id.*, Ex. 2 at 8 [8/23/99
Order].)  On November 7, 1997, Wolfert revoked McRann's authority over human resources,
which prompted McRann to complain to UGC about Wolfert's management decisions.  (*Id.*)  On

November 27, 1997, UGC informed McRann by letter that his employment with A-2000 would

be terminated, effective December 31, 1997.  (*Id.*)

**2.    *Procedural History***

     **a.    *Related Litigation in this Court:* McRann v. United International Holdings, Inc.*, Case No. 98–N–0895***

     On April 22, 1998, McRann filed a complaint in this court against UGC, UIH Asia, and

Austar United (the "Related Case"), in which he asserted six state law claims arising out of the

termination of his employment with A-2000.  (*Id.*, Ex. 2 at 9 [8/23/99 Order].)  In essence,

McRann claimed UGC made certain misrepresentations to him concerning both the Release

Agreement and the prospective employment agreement with A-2000, upon which he relied in both

executing the Release Agreement and accepting employment with A-2000.  (*Id.*)  McRann

asserted claims for: (1) breach of express or implied contract with A-2000; (2) fraudulent and/or

negligent misrepresentation in procuring the Release Agreement; (3) unjust enrichment; (4) civil

conspiracy; (5) promissory estoppel; and (6) intentional interference with his employment contract

and/or prospective relationship with A-2000.  (*Id.*)  UGC, UIH Asia, and Austar United

subsequently filed a counterclaim against McRann for employment taxes in the amount of

$98,000.  (*Id.*, Ex. 3 at 2 [Final J.].)

     On April 12, 1999, UGC, UIH Asia, and Austar United moved for summary judgment on

all of McRann's claims.  (*Id.*, Ex. 2 at 9 [8/23/99 Order].)  On August 23, 1999, this court

granted the motion in part and denied it in part.  (*Id.*, Ex. 2 [8/23/99 Order].)  The court granted

the motion as to McRann's claims for breach of the purported A-2000 employment agreement,

fraudulent inducement of the Release Agreement, and unjust enrichment, reasoning that: (1) McRann had presented no evidence that the parties finalized an employment agreement with A-2000; and (2) McRann had ratified the Release Agreement by accepting the $387,500 payment provided for thereunder and, therefore, could not seek to void the agreement under a fraudulent inducement theory.  (*Id.*, Ex. 2 at 15, 21, 24 [8/23/99 Order].)  The court denied the motion as to McRann's claims for promissory estoppel and civil conspiracy.  (*Id.*, Ex. 2 at 24 [8/23/99 Order].)

On July 20, 1999, Austar United became a publicly traded company and began offering stock options to its employees.  (Tr. of Prelim. Inj. Hr'g at 4 [filed May 30, 2002] [hereinafter "Prelim. Inj. Tr."].)  Around that time, McRann approached Austar United, seeking to restructure his remaining incentive interest into stock options, as provided for in paragraph six of the Release Agreement.  (*Id.*)  Austar United refused McRann's request.  (*Id.*)  On September 2, 1999, McRann moved to amend his complaint in the Related Case to add a claim seeking enforcement of the Release Agreement in connection with UGC's refusal to restructure his remaining interest. (Def.'s Mem. Br. in Supp. of Mot. to Dismiss Compl. or Stay Proceedings, or Alternatively, for Summ. J., Statement of Undisputed Facts ¶¶ 2–3 [filed January 2, 2002] [hereinafter "Def.'s Mot."].)  On September 30, 1999, the court denied McRann's motion to amend.  (*Id.*, Statement of Undisputed Facts ¶ 3.)

On July 30, 2001, the court held a status conference, during which it dismissed McRann's civil conspiracy claim and denied his request for a trial by jury in the Related Case.  (Tr. [filed Aug. 21, 2001].)  On August 1, 2001, McRann dismissed his remaining claim for promissory

estoppel and the parties filed a joint stipulation that judgment be entered against McRann for

$98,000 on UGC's counterclaim.  (Def.' Mot., Ex. E [Stipulation].)  The stipulation provided:

> Judgment shall enter in favor of [UGC, UIH Asia, and Austar United] and against
> [McRann] on [their] counterclaim in the amount of $98,000.  [The parties] hereby
> enter into a covenant not to execute on said judgment until [McRann's] claims
> against [UGC] and certain of its affiliated entities, pending before the Industrial
> Relations Commission of New South Wales In Court Session ("Australian
> Proceeding") reach final disposition. . . .  In the event that there is no award or
> judgment in favor of [McRann] in the Australian Proceeding, the covenant not to
> execute shall expire within ten [] days of the final disposition of the Australian
> Proceeding.

(*Id.*.)  On August 3, 2001, this court entered final judgment in favor of UGC, UIH Asia, and

Austar United in the Related Case.  (Final J. [filed Aug. 3, 2001].)  McRann appealed the final

judgment.  (Notice of Appeal [filed Aug. 28, 2001].)  On March 18, 2003, the Tenth Circuit

affirmed this court's decision, holding McRann had not established that he had formed an

employment agreement with A-2000.  *McRann v. United Int'l Holdings, Inc.*, 61 F. App'x 563,

2003 WL 1232582 (10th Cir. 2003).

### b.     Related Foreign Litigation: The Australian Proceeding

On May 4, 2001, during the pendency of the Related Case in this court, McRann filed a

summons for relief with the Industrial Court of New South Wales (the "Industrial Court") against

Plaintiffs.[3]  (Def.'s Mot., Ex. A [Summons].)  In the summons, McRann sought:

---

[3]The Industrial Court — formerly known as the Industrial Relations Commission of New
South Wales in Court Session — is a court created by Australian statute that is solely empowered
to review employment contracts and arrangements for fairness and to void or vary them if they are
unfair, harsh, or unconscionable.  (Def.'s Mot., Ex. B [Australian Industrial Relations Act.])

> An order varying the terms of the [Release Agreement] . . . so as to provide: [1] for the issue to [McRann] . . . of options to acquire 2,439,500 fully paid, ordinary shares of [Austar United stock] at a price of $1.80 per share, such options to be otherwise on the terms of the share options in [Austar United] granted to senior executives of [Austar United]; [2] for the payment to [McRann], on the failure to issue the options as aforesaid, . . . of such sum as would compensate [McRann] for any loss suffered by him . . . as a result of that failure; [3] for an order that [Plaintiffs] pay to [McRann] interest upon the amount of money ordered to be paid under Order 2; and [4] for an order awarding costs of . . . these proceedings to [McRann].

(*Id.*, Ex. A ¶¶ 1–4 [Summons].)  Further, McRann argued in the summons that:

> The [Release] Agreement has become unfair, harsh, and unconscionable in that (a) it provided for the restructuring, in good faith, of the [McRann's remaining incentive interest] into stock options and [those Plaintiffs] who are parties to the Release Agreement have failed and refused to undertake such a restructuring; (b) . . . the terms . . . were sufficiently non-specific [concerning the stock options] as to allow [Plaintiffs] to seek to exploit that uncertainty by failing to . . . honour their obligations thereunder; and (3) . . . [McRann] was promised certain rights under the [Release] Agreement . . . and a long term engagement to work at A-2000 [] on the terms of the A-2000 [a]rrangement.  [Plaintiffs] have since . . . sought to . . . deny [McRann] both the benefit of the A-2000 [a]rrangement and the benefit of any restructuring of his remaining [i]ncentive [i]nterest into stock options . . . .  Such conduct on behalf of [Plaintiffs] . . . renders the [Release] Agreement unfair, harsh, and unconscionable.

(*Id.*, Ex. A at 8–9 [Summons].)

On June 8, 2001, Plaintiffs filed a motion to dismiss the summons for lack of jurisdiction.

(*Id.*, Ex. B [Mot. to Dismiss].)  On September 13, 2001, Plaintiffs filed a reply to the summons, in which they argued: (1) McRann was estopped from denying the efficacy of the Release Agreement by this court's order in the Related Case; and (2) the Release Agreement itself prohibited McRann from bringing any legal claims against Plaintiffs relating to McRann's employment, the termination thereof, or any aspect of the Austar Employment Agreement.  (*Id.*)

In December 2002, the Industrial Court held hearings in the Australian Proceedings.  (Pls.'
Status Report ¶¶ 5–6 [filed Aug. 4, 2003].)  During the hearings, Plaintiffs argued that: (1) the
Commission had no jurisdiction over the matter because it had no ability to apply Colorado law in
order to enforce the Release Agreement and could only vary the Release Agreement pursuant to
its statutory jurisdiction; and (2) McRann was estopped from seeking to vary the Release
Agreement because this court found McRann had ratified the Release Agreement and its contents.
(Def.'s Status Report, Ex. A [Interlocutory Judgment] [filed July 23, 2003].)  On April 23, 2003,
the Industrial Court entered an interlocutory judgment denying Plaintiffs' motion to dismiss.  (*Id.*)
The Industrial Court reasoned that: (1) its statutory jurisdiction conferred by the Industrial
Relations Act could not be limited by a choice of law provision in a contract; (2) *res judicata* did
not bar McRann's claims before it because "the aspect of interpretation and enforcement of the
[Release] Agreement was not raised in the [Related Case], and . . . the power to vary the
[Release] Agreement neither was, nor could have been, raised."  (*Id.*, Ex. A at 17, 23
[Interlocutory Judgment].)  As will be discussed in further detail below, Plaintiffs appealed the
interlocutory judgment.

      *c.*    **The Instant Case**

On December 7, 2001, Plaintiffs filed an action in this court to enjoin McRann from
pursuing the Australian Proceedings and to obtain a declaratory judgment as to the interpretation
of the Release Agreement — particularly paragraph six concerning McRann's entitlement to stock
options.  (Compl.)  McRann did not file an answer to the complaint, but, on January 2, 2002, he
moved the court to dismiss or stay the proceedings, or, in the alternative, to grant summary

judgment.  (Def.'s Mot.)  More specifically, McRann argued that Plaintiffs' case before this court should be dismissed under the international abstention doctrine, because Plaintiffs sought determination of the same issue that was already pending before the Industrial Court in Australia. (*Id.* at 5–7.)  Further, McRann argued that: (1) the Australian court was competent to address the enforcement of the Release Agreement; (2) the Release Agreement did not prohibit McRann from bringing a legal action for enforcement in Australia; and (3) Australia was fairer to the litigants as a forum because the action had been pending longer there than in Colorado, UGC had stipulated to the completion of the Australian Proceeding, and UGC had previously fought McRann's attempt to amend his complaint to bring a stock option claim in the Related Case before this court.  (*Id.* at 7–12.)  On January 17, 2002, Plaintiffs responded to the motion, arguing that: (1) this court had already ruled the Release Agreement to be enforceable as written due to McRann's ratification thereof and, therefore, McRann's request to modify the agreement in the Australian Proceedings is improper; and (2) the Release Agreement expressly prohibited McRann from bringing a legal action to question its fairness.  (Pls.' Resp. to Mot. to Dismiss Compl. or Stay Proceedings [filed Jan. 17, 2002].)  Finally, on February 22, 2002, Plaintiffs filed a motion for a preliminary injunction to enjoin McRann from pursuing the Australian Proceedings.  (Pls.' Mot. for Prelim. Inj. [filed Feb. 22, 2002].)

On May 23, 2002, after an evidentiary hearing, the court denied Plaintiffs' motion. (Courtroom Mins. [filed May 23, 2002].)  The court found that: (1) Plaintiffs had failed to show the irreparable harm requisite to obtain a preliminary injunction; and (2) the Australian Proceedings appeared to be a case for enforcement — not modification — of the Release

Agreement and enforcement was not previously litigated in the Related Case.  (Prelim. Inj. Tr. at

207–10, 212–14, 217–19.)  On September 2, 2003, the court construed McRann's motion as one

for summary judgment, which it granted in part and denied in part.  (Order and Mem. of Decision

[filed Sept. 2, 2003].)  The court found that principles of international comity, fairness, and

efficient use of judicial resources warranted application of the international abstention doctrine in

this case.  (*Id.*)  As a result, the court abstained from exercising jurisdiction, stayed proceedings,

and administratively closed the case pending resolution of the Australian Proceedings.  (*Id.*)

> **d.     *Resolution of the Australian Proceedings***

On September 26, 2003, Plaintiffs were denied leave to appeal the Industrial Court's April

3, 2003 denial of the motion to dismiss the Australian Proceedings discussed above.  (Pls.' Reply

in Supp. of Request to Re-Open Administratively closed Case for [sic] Purpose of Accepting

Voluntary Dismissal by Plaintiff [sic], Ex. A at 1 [Davis Aff.] [filed June 30, 2006] [hereinafter

"Pls.' Reply."].)  On March 17, 2004, Plaintiffs moved the New South Wales Court of Appeal to

issue an order in the nature of a writ prohibiting the Industrial Court from hearing the Australian

Proceedings.  (*Id.*, Ex. A at 2 [Davis Aff.].)  On July 21, 2004, the Court of Appeal denied the

motion.  (*Id.*)  On May 11, 2005, Plaintiffs obtained special leave to appeal the Court of Appeal's

decision to the High Court of Australia.  (*Id.*)

On May 18, 2006, the High Court noted that pursuant to statute, the Industrial Court may

only decide matters concerning contracts under which parties perform work in an industry.

(Def.'s Resp. to Pl.'s [sic] Request to Reopen [sic] Administratively closed Case for [sic] Purpose

of Accepting Voluntary Dismissal by Plaintiff [sic], Ex. A at 5–6, 15–16 [Order [filed June 14,

2006] [hereinafter "Def.'s Resp.].) Reasoning that the Release Agreement set forth terms controlling McRann's termination, rather than terms under which McRann performed work, the High Court held that the Industrial Court did not have jurisdiction to hear and decide the Australian Proceedings. (*Id.*) Although the High Court has determined that the Industrial Court cannot hear the Australian Proceedings, the Industrial Court evidently does not have the authority to dismiss them. (Pls.' Reply, Ex. A at 2–3 [Davis Aff.].) Unless and until McRann affirmatively acts to discontinue or withdraw the Australian Proceedings, they remain pending before the Industrial Court in a sort of legal limbo. (*Id.*)

   e.    ***The Motions Presently at Bar***

   On June 12, 2006, Plaintiffs filed a motion to reopen the instant case in order to dismiss. (Pls.' Request to Re-Open Administratively Closed Case for [sic] Purpose of Accepting Voluntary Dismissal by Plaintiff [sic] [filed June 12, 2006] [hereinafter "Pls.' Mot."].) Plaintiffs argue the court should allow them to dismiss their action against McRann in this court either under Federal Rule of Civil Procedure 41(a)(1)(i) or 41(a)(2). (*Id.*) (Pls.' Notice of Dismissal Pursuant to Rule 41[a][1][i] or Alternative Mot. for Dismissal Pursuant to 41[a][2] [filed June 12, 2006] [hereinafter "Pls.' Br."].) On June 14, 2006, McRann responded to the motion. (Def.'s Resp.) On June 30, 2006, Plaintiffs filed a reply in support of their motion. (Pls.' Reply.)

   On July 12, 2006, McRann requested permission to file a surreply, because Plaintiffs had introduced new issues in their reply brief. (Def.'s Mot. for Leave to File a Resp. to New Issues Raised by Pls. in Pls.' Reply Br. [filed July 12, 2006].) On July 28, 2006, the court granted McRann's motion. (Min. Order [filed July 28, 2006].) On September 6, 2006, McRann filed a

surreply to Plaintiffs' motion. (Def.'s Supplemental Resp. to Pl.'s [sic] Request to Reopen [sic] Administratively closed Case for [sic] Purpose of Accepting Voluntary Dismissal by Plaintiff [sic] [filed Sept. 6, 2006].) Without seeking leave of the court, Plaintiffs filed a surreply to McRann's surreply. (Pls.' Reply to Def.'s Supplemental Resp. to Pl.'s [sic] Request to Reopen [sic] Administratively closed Case for [sic] Purpose of Accepting Voluntary Dismissal by Plaintiff [sic] [filed Sept. 11, 2006].)

On July 17, 2006, in the midst of briefing the motion to reopen the case, McRann tendered an answer to the December 1, 2001 complaint and counterclaims to the court. (Def.'s Tender of Answer and Counterclaims [filed July 17, 2006]; Def.'s Answer and Counterclaims [filed July 17, 2006] [hereinafter "Answer"].) McRann asserts three counterclaims against Plaintiffs, based on their failure to convert his remaining incentive interest into stock options, to which he was entitled under the Release Agreement: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) promissory estoppel. (Answer.) On July 24, 2006, Plaintiffs filed an opposition to McRann's tender. (Pls.' Opp'n to Def.'s Tender of Answer and Counterclaims [filed July 24, 2006].) On July 28, 2006, McRann responded to Plaintiffs' opposition. (Def.'s Reply [sic] to Pl.'s [sic] Opp'n to Def.'s Tender of Answer and Counterclaims [filed July 28, 2006].)

On November 21, 2006, McRann moved for a preferential trial date, reasoning that he is a natural person over seventy years of age who has meritorious claims. (Def.'s Mot. for Preferential Trial Date Pursuant to C.R.S. § 13–1–129 [filed Nov. 21, 2006].) On December 5, 2006, Plaintiffs responded to the motion. (Pls.' Opp'n to Def.'s Mot. for Preferential Trial Date

-16-

Pursuant to C.R.S. § 13–1–129 [filed Dec. 5, 2006].)  On December 20, 2006, McRann filed a

reply in support of his motion.  (Def.'s Reply to Pls.' Opp'n to Mot. for Preferential Trial Date

Pursuant to C.R.S. § 13–1–129 [filed Dec. 20, 2006].)

## ANALYSIS

### 1.    *Evaluation of Claims*

Plaintiffs bring their motion before the court under Federal Rules of Civil Procedure

41(a)(1) and 41(a)(2).[4]  (Pls.' Br.)  Rule 41(a)(1) provides that "an action may be dismissed by

the Plaintiff without an order of the court [] by filing a notice of dismissal at any time before

service by the adverse party of an answer or of a motion for summary judgment, whichever first

occurs."  Fed. R. Civ. P. 41(1)(a)(1).  Plaintiffs argue that this rule applies, because McRann has

not filed an answer or a motion for summary judgment to date in this case.  (Pls.' Br. at 2.)  In an

attempt to remedy the obvious flaw in this argument, Plaintiffs contend that McRann's January 2,

2002 motion to dismiss, stay, or for summary judgment is not "the kind of filing that would

prevent Plaintiff[s] from voluntarily dismissing" their claims.  (*Id.*)  Plaintiffs' contention is

specious, given their overt admission that this court construed the motion as one for summary

judgment in issuing its September 2, 2003 order.  (*Id.*; *see also Facts* § 2c, *supra*.)  Plaintiffs'

motion arising under Rule 41(a)(1) is summarily denied.

_____

[4]McRann does not object to reopening the case.  (Def.'s Resp. at 1.)  Accordingly, the
court does not discuss the issue further.

-17-

Alternatively, Plaintiffs move to dismiss under Rule 41(a)(2), which provides:

> an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

Fed. R. Civ. P. 41(a)(2). It is beyond dispute that McRann did not plead a counterclaim before Plaintiffs served their motion to dismiss. First, the court notes that McRann has not filed, but only tendered, his counterclaims in this court. (Def.'s Tender of Answer and Counterclaims [filed July 17, 2006].) Even assuming that the tender could suffice as filing, Plaintiffs served their motion on June 15, 2006, more than a month before McRann's July 17, 2006 tender. (*See id.*; Pls.' Br.) Accordingly, the court finds that application of Rule 41(a)(2) is appropriate in this case.

Rule 41(a)(2) "'is designed primarily to prevent voluntary dismissals which unfairly affect the other side, and to permit the imposition of curative conditions.'" *Brown v. Baeke*, 413 F.3d 1121, 1123 (10th Cir. 2005) (quoting *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 357 [10th Cir. 1996]). Generally speaking, "absent 'legal prejudice' to the defendant, the district court normally should grant [] a dismissal [under Rule 41(a)(2)]." *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997). Although "legal prejudice" is not a clearly defined term, the Tenth Circuit has promulgated a number of factors to consider in analyzing whether a defendant will suffer from same. *Id.* These factors include: (1) the opposing party's effort and expense in preparing for trial; (2) excessive delay and lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of litigation. *Id.*

-18-

(citing *Phillips*, 77 F.3d at 358).  The court's ultimate goal in considering these factors is to
ensure that "substantial justice is accorded to both parties."  *County of Santa Fe v. Public Serv.
Co.*, 311 F.3d 1031, 1048 (10th Cir. 2002).  Therefore, dismissal may be appropriate where not
all of the factors weigh in the plaintiff's favor, and may be inappropriate where not all of the
factors weigh in the defendant's favor.  *Phillips*, 77 F.3d at 358.

      Plaintiffs do not directly discuss the factors set forth above, but implicitly argue they
militate in favor of dismissal.  (Pls.' Br. at 3–5.)  McRann does not respond to Plaintiffs' Rule
41(a)(2) arguments, but instead "seeks leave to respond . . . within [twenty] days of this case
being reopened" and cites the twenty-day default response deadline contained within United
States District Court for the District of Colorado Local Rule 7.1C.  (Def.'s Resp. at 5.)  This
court finds McRann's response nothing short of baffling.  First, as to form, McRann's request is
contained within his response brief to Plaintiffs' motion.  (*Id.*)  This presentation is especially
egregious, given that Local Rule 7.1C — the same rule McRann cites in his request — expressly
states as follows: "A motion shall not be included in a response or reply to [an] original motion.
A motion shall be made in a separate paper."  D.C.COLO.LCivR 7.1C (2006).  Further, as to
substance, McRann proffers no reason for the delay he requests, and this court finds none.  (*See
Def.'s Resp.)  Despite his request for leave to file his response to Plaintiffs' Rule 41(a)(2) motion
at a later date, McRann proved to be entirely capable of responding to Plaintiffs' Rule 41(a)(1)
motion.  (*Id.* at 3–4.)  This court is at an utter loss to ascertain what, other than pure caprice,
underlies McRann's request for additional time to respond to one set of Plaintiffs' arguments as

opposed to another.  In the absence of any explanation by McRann, his request for leave is

denied.  With that matter settled, the court turns to analysis of the factors themselves.

Concerning the first factor, Plaintiffs assert that McRann has "spent little to no money

*preparing for trial*."  (Pls.' Br. at 4 [emphasis in original].)  The court is inclined to agree.  The

record reveals that over the course of this case, McRann has filed: (1) two supporting briefs

concerning his motion for dismissal, stay, or summary judgment; (3) an opposition brief

concerning Plaintiffs' motion for a preliminary injunction and exhibits for an evidentiary hearing in

connection therewith; (4) one status report; (5) opposition briefs to the motion presently at bar;

and (6) a notice of his tendered answer and counterclaims.  (*See Facts* §§ 2b–e, *supra*.)  The

number, tenor, and content of these filings all reflect the remoteness of trial in this case.  It is thus

markedly difficult to conclude that McRann has spent significant effort or expense in preparation

for trial.

As to the second factor, Plaintiffs assert that they have not caused any delay in prosecuting

the instant case and underscore that it was McRann who caused the case to be stayed.  (Pls.' Br.

at 4.)  Again, the court is inclined to agree.  It is beyond dispute that McRann's motion led to the

three-year stay and administrative closure of the case.  (Def.'s Mot.)  Moreover, Plaintiffs filed

their motion to dismiss on June 12, 2006, less than a month after the High Court made its

determination in the Australian Proceedings.  (*See* Pls.' Br.; Def.'s Resp., Ex. A at 5–6, 15–16

[Order].)  As such, this court finds no delay or lack of diligence on Plaintiffs' part.

As to the third factor, Plaintiffs' complaint consists of claims for: (1) breach of the Release

Agreement in the form of McRann's institution of the Australian Proceedings; (2) a permanent

injunction enjoining McRann from pursuing the Australian Proceedings; and (3) a declaratory

judgment from the court interpreting the amounts due to McRann for the second payment under

the Release Agreement.  (Compl ¶¶ 26–36.)  Plaintiffs now argue that dismissal is appropriate.

(Pls.'s Br. at 4–5.)  It is beyond contention that Plaintiffs' claim for a permanent injunction is

clearly moot.  (*See id.* at 4.)  Plaintiffs then argue that it is equally futile for them to pursue their

claim for a declaratory judgment, as this court has already declined to exercise jurisdiction, as

stated in its September 2, 2003 order.  (*Id.*)  In essence, Plaintiffs decline to ask this court to

reconsider its prior decision.  The court finds the Plaintiffs to be well within their rights in so

doing.  Finally, Plaintiffs note that McRann has been ordered to pay Plaintiffs' legal fees for the

intermediate and final appellate portions of the Australian Proceedings and will be ordered to pay

Plaintiffs' legal fees for the portions before the Industrial Court when and if he officially closes the

case.  (*Id.*)  Plaintiffs emphasize that in their complaint before this court, they sought

reimbursement of their damages in defending the Australian Proceedings as a remedy for their

breach claim and assert that the High Court's order has essentially granted that remedy.  (*Id.*; *see

also* Compl. at 9.)  In light of the foregoing, the court finds Plaintiffs' explanation to be sufficient

to support dismissal.

      Finally, regarding the fourth factor, although this case has been pending before this court

since 2001, it is in its infancy with regard to trial.  Indeed: (1) McRann has only recently tendered

an answer and counterclaims; (2) there has been no Rule 16 conference, and (3) neither a

scheduling order nor a preliminary pretrial order has been filed.  In summation, McRann has not

expended significant resources, Plaintiffs did not delay in filing their motion, Plaintiffs have

adequately explained their desire to dismiss, and the matter is in the earliest stages of trial preparation.

The foregoing analysis compels the court to conclude that dismissal would not cause McRann to suffer legal prejudice. *Cf. In re Fairchild*, 969 F.2d 866, 868 (10th Cir. 1992) (finding denial of dismissal appropriate given the large amount of time and resources expended by IRS in preparing for hearing and the fact that the motion was made the day before the hearing and only after debtor had requested and been granted two continuances). Accordingly, Plaintiffs' motion is granted. Because Plaintiffs' claims have been dismissed and McRann's counterclaims are not presently pending before this court, McRann's motion for a preferential trial date is moot and, therefore, denied.

## 2.  *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.  Plaintiffs' motion to reopen and dismiss (#48) is GRANTED. The case is reopened exclusively for the purpose of dismissing Plaintiffs' claims.

2.  McRann's motion for a preferential trial date (#65) is DENIED as moot.

3.  The clerk shall forthwith dismiss Plaintiffs' claims against Defendant without prejudice and close the case. Defendant may pursue his counterclaims only by filing a new case. Defendant may have his costs by filing a bill of costs within eleven days of this order.

Dated this 23rd day of March, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge